May it please the Court, my name is Shannon Polvey and I have the honor of representing Deanna Evans, the appellant in this case. There's four claims on appeal before you today. I want to jump right in to the first issue that I brought within the brief because it is the most macro of the issues, the most encompassing, and that is, did the District Court err in granting summary judgment with the proof that we put forth in opposition to the motion for summary judgment. So the key here is first to consider, in addition to my client's own testimony, we had ten other witnesses provide sworn testimony corroborating the allegations that my client has brought against her former employer. My client... You're saying those affidavits go to the hostile work environment claim? Yes, Your Honor, is that within the affidavits and deposition testimony, each individual who testified provided general statements that they saw discrimination and retaliation in the workplace, and then after each of those statements, they provided specific examples that they observed of what Ms. Evans experienced and what other individuals in her protected class experienced. What's the case that you believe is most applicable? We have a number of cases that talk about the level of pervasiveness, the level of severity. Which is the one that you think is most on point with the information and the evidence that's been presented in this case? I would say probably Ziske is one of the best examples, and that is the one extensively cited by Judge West, who was the magistrate judge in this case. She provided a recommendation to the district court recommending that my client's hostile work environment and constructive discharge claims proceed for her race and gender discrimination claims to trial. Do you think the facts here approach that level of severity of the comments? Those were the comments of a sexual nature that were described in detail. Is it your position that what you put forth of evidence rises to that level? Yes, Your Honor. In a different context, in the sense that discrimination claims can be proven through direct proof or the McDonnell-Douglas burden shifting, and as I emphasized first and foremost in the brief, we do have direct evidence here. For example, my client being essentially told offensive statements about her natural haircut, a short afro at the time, essentially preventing her from being able to participate in client interviews and essentially tours around the Eastover Mill, very essential to the advancement of her career. For example, other statements that certain black employees were talking like they were from shoot-em-up, bang-bang neighborhoods, making jokes about herself and different things of that nature. For instance, Ms. Garrett testified about overhearing white male supervisors making fun of and making offensive statements about Ms. Evans. All of those are examples of direct evidence in the case. And then we put it in context of the overall hostile work environment. I think it cannot be discredited when we consider that a significant portion of the individuals who worked in that very workplace have testified that they were subjected to discrimination. When we have... This strikes me as a little bit of an unusual case in the sense that the direct evidence doesn't seem to be as strong as the evidence of how other people were treated. And I know under Ziske, we have said that it is probative how other people were treated in determining hostile work environment. And there's some pretty compelling evidence, it seems to me, in the record in terms of the use of the N-word and other things like that in terms of the environment that was experienced by other employees. How do we factor in the fact that evidence of other employees seems to be stronger, or do you disagree with that? The KKK hat, the different things that are really, really outrageous with regard to the other employees, but then you have this employee's claim, while the remarks are offensive, they don't rise to that level. So how does that factor in and how do we evaluate that? Yes, Your Honor. I think one of the key points to address that question is to consider that my client was the first black female manager in the finished products department. It's essentially almost like a glass ceiling type of treatment of what she first experienced. From the day she first arrived, as noted, Mr. Niman, the manager in the department, specifically said, and it's in the record, that she was being targeted. He acknowledged back in 2012 that she was being targeted. It didn't stop in 2012. It continued and escalated to the point of her constructive discharge. And with regard to the specific type of treatment, I believe there's two affiants within the record who specifically identified that Deanna essentially treated to a workplace like hell on a daily basis. So those are individuals outside of... It's a conclusory though. Hell. What's hell? Hell to you and hell to me might be different. Right. I would agree, but I think that's where we look at the bigger picture of, I believe it's Harris versus Forklift, where it talks about the different factors of what would be severe and what would be pervasive and what type of things, be it physically offensive, be it intimidating, be it affecting her ability to do her job. And ultimately, we can look at Ms. Evans' reports. She was interviewed twice by HR Investigations in which she reported discrimination in both of those HR Investigations. She reported it to her direct supervisors. She reported it to the mill manager. She reported it in her exit interview. So there's the consistency of showing that it was continuing and escalating. And even to the point at the end of my client's employment, she was losing her hair. And so that type of workplace was causing her to have physical ramifications that were affecting her ability to live her life, not only in the workplace, but outside of it. Back to Judge Keenan's question. The references with respect to Ms. Evans are indeed offensive. And I hope my questions don't suggest anything to the contrary. But as the evidence is presented, it seems like there may be information that comes from other affiance, third parties that she may not have even been aware of, that if you would impute to her state of mind, in theory, might be more severe and pervasive. Is that something we're allowed to do? I mean, I know it's probative what third parties bring, but does that, I'm not sure there's something that allows us to say that you almost impute to her the information that was known by others. Does that question make sense? Yes, Your Honor. And I think I've even looked at the standards in like EEOC versus Sunbelt and Oncology and cases like that, where my client had testified and other witnesses testified, for instance, that Mr. Cronin consistently subjected, a peer of hers in the management team subjected her to direct disrespect to offensive statements. She testified that he, both he and I think outside of what any individual could consider normal. And we can't look at it from an isolated perspective. I think my emphasis has been always to look at the totality of the circumstances in which Ms. Evans was working. And she diligently tried to resolve this hostile work environment from a severe and pervasive standard. It's an intolerable work environment that she put the Eastover Mill on notice of numerous times prior to her constructive discharge. So it's imputed to them to fix this environment that they've been on notice, not only from Ms. Evans, but as their own HR manager described it as a myriad of complaints. And so from this perspective of was it, I think the focus of appeal for the hostile work environment and constructive discharge claims hinges on what would a reasonable person in Ms. In this case, does the hostile work environment necessarily set up the constructive discharge? I realize in most cases and that our case law says that it can. But here we have the unusual situation of her writing a very nice letter saying how much she enjoyed her employment. And she's hoping to make the transition easy for the company and things like that. So while there might have been a hostile work environment with regard to the racial slurs that people were subjected to, how is there sufficient evidence to create a disputed issue of fact as to constructive discharge when she wrote this very effusive letter about how much she said there were challenges in working there, but pretty much on base, she enjoyed her employment. And she'd work hard to be a good transition. And how do you get a constructive discharge out of that? I think the distinguishing is that essentially the employer is the one who put out the notice essentially internally that was of, I would say, a positive nature. Ms. Evans' exit interview letter that I believe is dated on around March 24th, specifically she identifies the why of why she's leaving. She wrote that letter too, the letter I'm talking about. She was the author of the letter. I believe, Your Honor, with regard to the one that was internal, that was something that Mr. Verity orchestrated, that her exit interview is really what she was wanting the company to know of. The other was something that's internally throughout the whole mill. She created a disputed issue of fact as to discharge out of the inconsistencies in her evidence, I guess is what I'm asking you. If she wrote this effusive letter, yet at the same time said that she was forced out. And to that very point, I think you're right, Your Honor, that that would be an issue of material issue of disputed fact, which would lend itself to the denial of summary judgment is that International Paper is entitled to its defense as it outlined in its brief, that Ms. Evans was an excellent employee, that they wanted to provide her these opportunities. But the fact of the matter is, as I note with the, and I haven't even touched on the disparate pay aspect, but that Ms. Evans was in roles, the exact same roles as white male comparators and some black male comparators and had two totally different pay when they were PL14 in the exact same role. And so ultimately, when we look at those different pieces of evidence, it's a totality of what Ms. Evans was experiencing. The employer tried to induce her to come back? The, I would say to some extent, they, when she was indicating that she was leaving because of the treatment, the mill manager indicated that he would investigate further, but that was simply a reiteration of what she had already previously brought to his attention and no action was taken in the months prior to her constructive discharge. But ultimately- No evidence you're saying that they tried to persuade her to come back and change her mind? I believe that there is, I would dispute that depiction of it. International Paper may believe otherwise. I would say that Ms. Evans, I think the record shows that the exit interview conversation with the mill manager indicated he personally would like Ms. Evans to stay with the company, but the mill manager's indication is not reflective of the workplace that actually Ms. Evans was experiencing within the finished products department and then also dealing with them under her supervision with Mr. Verity. Thank you. Ms. Gray? Thank you, Your Honors, and good morning. I'm Kristen Gray with Ford & Harrison appearing on behalf of International Paper. As much as Ms. Evans today tries to paint this distorted image of her time with International Paper, the record evidence in this case is that she enjoyed a successful career marked by multiple promotions, pay raises, these high-profile leadership opportunities where she's leading these high-profile initiatives within the company. She's presenting at mill-wide meetings. She's even getting to help draft a job description for a new promotion. I don't mean to interrupt you on that, but I wanted to get to a question, make sure you have plenty of time to deal with it. The district court's order doesn't address the third parties. The Maastricht judge does. The district court, I don't think, mentions that. Two questions. What's your response to the notion that the third parties, A, need to be considered and, B, in fact, do they provide the objective standard for what is a hostile environment? Certainly, Your Honor. Excellent question. As this court has established, the totality of the circumstances will be examined and affidavits and testimony from other people kind of play into the contours of a workplace, so they're not in a vacuum, so to speak. However, the evidence in this case as far as reaching an objective standard is the issue. This is not a situation where she can simply state that her subjective feelings, beliefs, and perceptions give rise to a hostile work environment, constructive discharge claim. The affidavits, you'll notice their statements fly in the face of the record evidence. There are statements in there that Ms. Evans worked harder, did better, but she received less recognition than white male comparators. That's simply not the facts of this case. Are you saying then that if what the third parties perceive themselves and may have observed about Ms. Evans, you're saying what she experienced was objectively different than what they described with respect to themselves or others? Absolutely, Your Honor. Their subjective perceptions or beliefs fly in the face of the evidence. It's not subjective to say that the N-word was used freely in the environment without repercussions, that racially offensive YouTube videos were shown by Brian Coleman to employees during work time, that the same Mr. Coleman told people to come to a black man that he had to come the white door and he needed to go back out and enter through the black door. How can you say that that's not evidence of a hostile work environment? Your Honor, I would point out that these allegations from the affidavits, they span decades. Are you saying they're stale? I think that we have to look at the totality of the circumstances and keep in mind the fact that if it spans a series of years, it dilutes the conduct. In addition, we're talking about the finished products department and Ms. Evans actually had not worked in that department in the year and a half leading up to her resignation. She voluntarily resigned. Is that for a jury to evaluate though with regard to a hostile work environment? In other words, she's saying, I had to work in this environment where the N-word was used all the time, KKK hats were worn, racial videos were shown, and then you could ask questions saying, well, wait a minute, you didn't experience any of that for years, did you? This was a long time ago. And then the jury weighs that. Isn't that the function of the jury rather than you asking us to determine that because some of the things happened a year earlier or two years earlier, it couldn't have been that offensive? Your Honor, there has to be a genuine issue of material fact. There has to be sufficient evidence presented by Ms. Evans that would give rise to the need for a trial. And in this case, Judge Michelle Childs thoroughly considered the record and came to the conclusion that the evidence was lacking. Is the issue that Judge Kenan talked about that if Ms. Evans had experienced those specific things herself, that might be one thing? That was kind of my question is, assume you have third parties talking about the general environment that Ms. Evans had not presented evidence that she had specifically experienced. How do we address that situation? Correct, Your Honor. And I think that's an important distinction to point out that in essence, Ms. Evans is attempting to prop up her and weaker claims with allegations from others. Right. And it seems like Zyske allows that. Frankly, I was surprised with that language in Zyske because it's saying that evidence about how other employees were treated in that same workplace can be probative of whether the environment was indeed hostile, even if the plaintiff did not witness the conduct herself. You know, I assumed actually the contrary and I was wrong. I mean, Zyske says it. How do you get around that? Well, Your Honor, in the Zyske case, we had a situation where the testimony of these third parties was disregarded. That's not the situation here. All those allegations were carefully considered by the lower court and found to be lacking. And in this case, Ms. Evans bears the ultimate burden of proving intentional discrimination based on her race or her sex. And in this case, we have a situation where she was recognized as one of the two highest performers at the facility. She was awarded the Chairman's Coin. And I can't emphasize enough the gravity, the wonderful honor that that is. It's extremely rare for an employee to receive the Chairman's Coin. It's a company-wide accolade presented by the CEO. She was supported. It still could be hostile if people were using the N-word around her all the time. I understand what you're saying. You know, this is a pretty special employee and it's sort of the atypical case, just like Perkins is. You have two model people bringing these claims as opposed to kind of everyday line workers. You have two people who in terms of their performance on the job. But it seems to me that it's a non sequitur to say that because they were superlative employees, that they couldn't have exhibited those qualities in nonetheless a hostile work environment. I understand your honor, your point. But in this case, Ms. Evans does need to stand on her own allegations. And considering the totality of the She received the highest accolade in the company. She was supported in that Chairman's Coin by the very person that she accuses of race and sex discrimination. She testified that he was proud of her, that he was thrilled that she had won this, that he had supported her in that. And in fact, it had taken him 33 years to reach that honor, whereas it took her the relatively short period of seven years. This is someone who was recognized as a star. She was on the fast track to further promotion. They were identifying the third quarter as the next promotion for her. Said that she was ready to be challenged again. All these positive things. She's constantly being recognized. This is not a situation where an employee, a reasonable person in those circumstances would feel compelled to resign. Absolutely. I think you're absolutely right. This negates the constructive discharge, or arguably negates it. But how does it negate the hostile work environment claim? Your Honor, as the lower court recognized, Ms. Evans has never insisted that her hostile work environment claim was anything other than a hostile environment constructive discharge claim. The hybrid claim of the two, where you have the standard of severe pervasive as a lesser component of the graver offense of constructive discharge. They don't have to be coupled like that, do they, as a matter of law? They don't have to be coupled, Your Honor, but that's the- Where in the record does she say that hers are inexorably linked? Your Honor, there's a notation in the district court's order mentioning that she never disputed the fact that this is a hostile environment constructive discharge claim. But even assuming that she had pleaded a separate hostile work environment claim that was separate from the constructive discharge claim requiring objective intolerability, she still doesn't rise to the severe pervasive level. She describes some comments that- But the other employees' affidavits are severe and pervasive, aren't they? Your Honor, those cases aren't before this court. It's simply Ms. Evans- Right, but Ziske brings them in, doesn't it? And considering the totality of the circumstances, just as Ms. Evans' allegations don't occur in a vacuum, neither do the affidavits as well. And those individuals have not brought claims in this case. In this situation, we have an employee who had ample opportunities. She was given the opportunity to continue to excel. The evidence in this case is that she would have continued to soar if she had decided to stay. She elected to choose employment elsewhere with a higher paying salary. And as Your Honor noted, she wrote a very nice letter, effusive, talking about her opportunities, considered the ISO projects to be highlights of her career. And it's undisputed in this case that she received ample opportunities, that she received accolades, company-wide recognition. The person she accuses of race and sex discrimination regularly was sending emails to higher management, copying her, praising her, putting her up to continue to excel. This is simply not a case that gives rise to either the severe or pervasive standard or to the higher standard of objective intolerability for constructive discharge. She alleges that this is a glass ceiling type situation, but there's simply no evidence of that. She was on the fast track to further promotion when she decided to resign. She mentions in there that there was some issues with pay. We have that Equal Pay Act claim. But in this case, first of all, she's presented no evidence that two of these comparators ever even earned more than she did. As to the other one, she hasn't established the equality standard that's required for an Equal Pay Act claim, which is a high burden for a plaintiff to carry. In this case, she simply offers her speculation that they earned more. That's her subjective belief. There's no evidence to support that. And it certainly doesn't meet the demanding threshold under the EPA that was recognized by the Spencer v. Virginia State case. In this situation, we have an employee who had ample opportunity to excel. This is not someone whose circumstances give rise to a severe pervasive standard, even considering the affiance testimony. And as far as her retaliation claim, she has to establish but for causation. In this case, she hasn't, to the extent she engaged in any protected activity, she hasn't connected it to any sort of adverse employment action. In fact, the lower court was very unclear on what even was the adverse employment action. She's argued in this case that things such as getting a nickname, generally being, quote unquote, treated worse, left out of unspecified meetings, that these were the adverse employment actions. But there's simply no case law cited by her that would support these types of allegations, that this would support an adverse employment action. There's no evidence that she suffered anything that was materially adverse to employment. In this case, she has simply alleged a few straight comments. The facts of this case are she got promotion after promotion. She was going to continue to get promotions. And when she chose to submit her resignation, the plant manager contacted her and said, I'm not ready to accept reality. What can I do to help? This is a big company. We can accommodate you. Tell me what I can do to get you to stay. And she chose to leave. She chose to accept employment with another company, with a higher base salary. She generally makes a statement in the reply brief that she earned less at her subsequent employment. There is absolutely nothing in the record to support that. In fact, you'll see in the reply brief there was no citation to the record at all, because there's simply no evidence in this case to support that allegation. And in this case, Your Honor, there's simply a situation of an employee, high performer, well-regarded, well-received, highly respected, promotion after promotion, pay raises. There's simply no evidence that this is somebody who was subjected to a severe, pervasive work environment that was abusive. There's no evidence that she raises any sort of objective intolerability allegation here. These facts simply don't give rise to the claims that she's alleged in this case. And we are asking that this court affirm the decision of the lower court, in which the court carefully considered the record, carefully considered the evidence that she presented. As much as she tries to rely on the experiences of other people, we do have to question what did Ms. Evans experience? She experienced ample opportunities. It was clear that no one wanted her to resign. They tried to convince her to stay and pointed out it's a huge company. What can we do to keep you? This is not someone that anyone wanted to lose. She was someone that was highly valued. It's clear they wanted her to stay. This is simply not a case of hostile environment, constructive discharge, retaliation, or any sort of equal pay act situation. She hasn't met the high threshold for any of these claims. And for those reasons, we're asking that the court affirm the lower court decision. Thank you, Ms. Gray. Thank you. Ms. Paulvey. Thank you, Your Honors. As I started in my reply brief, it's key to consider if all of those things, as depicted by my colleague, were occurring, why in the world would Ms. Evans have left? The fact is, is because her daily workplace was miserable. She wasn't working in a daily workplace with the plant manager. Who she was working with was the finished products department with her supervisor, Mr. Verity. And when we look at the joint appendix 74 through 76, Judge West aptly summarized some of the key examples of the personal treatment that Ms. Evans received that prompted this hostile work environment and constructive discharge claims. For instance, the things that we've already discussed with Mr. Cronin, the statement about her hairstyle, which can't be underplayed because ultimately, if my client is in a manager position and she's not even able to visit or lead meetings with the very team that she's tasked with leading, how is she going to develop within the company? And for instance, after she brings her concerns, she goes from being, as evaluated, an excellent employee to a meets expectation. So when my client was inquiring about locations to work outside of that Eastover Mill where she's experiencing this hostile work environment, that meets expectations is likely to be a barrier. And that happened after her protected activities. That's taken a little bit past the record. I mean, it looks like from what I reviewed that she received the exceeds commitment evaluation. And you're right. They did the next one with meets. But as that was described, I didn't see anything in the record that was perceived as negative or was impairing her ability to move. It seems to me what you have here is the question of whether her description of her environment is enough and to what extent we consider these third parties or third party employees whose experiences may have been more specific and more severe. And in Zyske, certainly that's something that is talked about that's probative. But it seems like the plaintiff's experience herself in Zyske was perhaps more severe and more pervasive. That's maybe not. But I think the issue we kind of started off with the relationship between the two is the key issue for you to address. Yes. And I think the personal experiences that Ms. Evans experienced on a daily basis have to be put in context of what other people were experiencing. And I quoted in the brief an example from the affiant Ms. Benson who after Ms. Evans left or as she was leaving, she spoke with Ms. Evans and she specifically, Ms. Benson, stated based on what she saw, I understand why she had to leave. The treatment she received merited anyone wanting to leave and find employment elsewhere. But that's opinion testimony though. That's not a statement of fact. That's not like they were wearing KKK hats. They were using the N word. That's just one employee's subjective perception. I don't think you can rely on that. We'll put in context of the nickname, Angela Davis, right before she's leaving. The comments about her hair, preventing her from being able to meet with outside visitors. Those are all things that direct evidence that she has testified about experiencing as well as other people have testified different pieces. It's not like one affidavit or one testimony is the whole picture. It's all 11 of these testimonies. It's the HR investigations that repetitively were showing the same type of workplace over and over again without change and without improvement. So I think that the specific things that happened to Ms. Evans, that those direct evidence proof, are in the context of being yelled at at meetings, being prevented from even attending some meetings, being excluded, or when she attends meetings, things being blamed on her or her area of leadership when there's nothing to account for that. For instance, even accusing her of adding water to one of the chemicals, essentially accusing her of sabotaging the plant. Those types of things are directly applicable to a hostile work environment that Ms. Evans was subjected to. And just briefly, because I see my time is getting narrow, I want to touch on the retaliation claim. Because ultimately, the district court dismissed the retaliation claim on the basis of finding that there was no adverse action. But the most important and first and foremost to note is a constructive discharge is an adverse action. Green versus Brennan, Nassar, both cases about constructive discharge identify that constructive discharge is an adverse action. Nassar... On that issue, the causation between her meetings, which occurred over a period of years, and her constructive discharge are almost unconnected, especially in the circumstance where she writes a letter saying she appreciated her employment. And then the general manager says, can we move you somewhere where you'll be happier and try to keep her there? And the end interview, it doesn't sound to me that the company wanted to part with her. And that doesn't sound like retaliation. In other words, it's inconsistent with retaliation. All of those acts are inconsistent with the retaliatory cause. If they wanted to retaliate, they could fire, or they could demote her, or they could do other acts in between. But the idea that it was totally her decision to leave hardly shows that the reasons that she complained in a meeting about certain conditions yielded action by the employer. You have to focus on what the employer did in response to her complaint. Yes, Your Honor. And I think with regard to your point, is that Ms. Evans participated in the HR investigation providing protected activity participation in October of 2014, as well as in her contacts with Mr. Verity and Mr. Ninn, the mill manager, preceding her constructive discharge and inverted into that time prior to her constructive discharge after that. When was the meeting? The meeting. October 14? Yes, that was the HR investigation. When did she resign? End of March 2015. And when we look at the events that occurred in between there, the key piece that I think is important to note is the nickname of Angela Davis. It's told to her that that's her nickname, not just by one person. That's just her nickname being used. And when Ms. Evans follows up with the individual who tells her this is her nickname as to why, the response is, well, she stirred up trouble too. So that clearly, I think, is evidence to show that there is retaliation in the workplace following her protected acts. All right. Thank you, Ms. Paulby. Thank you. We'll come down and greet counsel and proceed on to the next case. Thanks.
judges: Paul V. Niemeyer, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.